**AFFIRMED; Opinion Filed August 2, 2017.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-16-00254-CV

**N.F., Appellant**
**V.**
**A.S., Appellee**

### On Appeal from the 116th Judicial District Court
### Dallas County, Texas
### Trial Court Cause No. DC-14-01188

## MEMORANDUM OPINION

Before Justices Bridges, Lang-Miers, and Evans
Opinion by Justice Evans

N.F. appeals from a final judgment rendered after a jury trial on A.S.'s personal injury lawsuit against him. In two issues, N.F. challenges the legal and factual sufficiency of the evidence supporting causation and future medical expenses. In a third issue, N.F. contends the trial court erred in refusing to strike a portion of A.S.'s expert's causation testimony. For the reasons that follow, we affirm the trial court's judgment.

### BACKGROUND

A.S. sued N.F. alleging he infected her with genital herpes. The evidence at trial revealed the following facts. A.S. and N.F. met through a dating website in January 2012. Although N.F. testified he told A.S. in January that he had genital herpes and could give her a sexually transmitted disease, she denied that N.F. told her he was infected with an STD. On April 29,

2012 they had sexual intercourse for the first time. Both parties agree that although the two discussed using a condom, no condom was used. A.S. testified the intercourse was painful because N.F. proceeded too quickly and she had not had intercourse in a long time. In his testimony, N.F. confirmed A.S. told him immediately before their first sexual encounter, "I haven't done this for five years." The next day, the two had intercourse in the morning and then again that evening. A.S. testified that N.F. was her sixth sexual partner. She admitted however, that she had had unprotected sex with at least one of these prior partners.

On May 5, A.S. texted N.F. stating she had been sick all week and was having "severe burning and pain" in her genital area. She also indicated to N.F. that she took some old antibiotics "a couple of days ago" but they were not working. She then went to N.F.'s home where she asked him to examine her indicating to him that she felt like she had a small cut. When A.S.'s symptoms did not resolve, N.F. arranged for A.S. to see a gynecologist on May 11. The culture performed on May 11 revealed that A.S. did not have a bacterial infection, but had herpes. On May 17, A.S. had a blood test confirming that she had Herpes Simplex Virus-2 (HSV-2). The blood test showed elevated levels of two HSV-2 antibodies, IgM and ImM.

According to A.S., although she was upset at N.F. for giving her herpes, their relationship continued until N.F. ended it shortly after Labor Day 2012. However, A.S. continued to contact N.F. until sometime in April 2013. She filed this lawsuit in February 2014, as a counterclaim to N.F.'s suit to recover certain items in A.S.'s possession. After N.F. nonsuited his claims, the trial court re-aligned the parties to name A.S. as the plaintiff and N.F as the defendant. The matter was tried before a jury. At the conclusion of the trial, the jury returned a verdict in favor

of A.S. The trial court rendered judgment in accordance with the jury's verdict awarding A.S. $1,440,661.38 plus post-judgment interest.[1] N.F. filed this appeal.

## ANALYSIS

In his first and second issues, N.F. challenges the legal and factual sufficiency of the evidence supporting causation and the jury's $300,000 award for future medical expenses. When a party challenges the legal sufficiency of the evidence to support an adverse finding on which he did not have the burden of proof at trial, he must demonstrate there is no evidence to support the adverse finding. *See Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983). Our review of such a challenge considers the evidence in the light most favorable to the judgment and indulges every reasonable inference that would support it, crediting favorable evidence if a reasonable factfinder could and disregarding contrary evidence unless a reasonable factfinder could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 821–22, 827 (Tex. 2005). The finding will be upheld if more than a scintilla of evidence supports it. *See Stafford v. Stafford*, 726 S.W.2d 14, 16 (Tex. 1987).

In reviewing for factual sufficiency, we consider and weigh all of the evidence, not just the evidence that supports the finding. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1988). We may set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id.*; *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

Under either sufficiency analysis the factfinder is the sole judge of witness credibility and the weight to be given their testimony. *See City of Keller*, 168 S.W.3d at 819 (legal sufficiency); *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) (factual sufficiency).

---

[1] The trial court reduced the jury's monetary award to A.S. to reflect the jury's finding that A.S. bore 30 percent responsibility.

Moreover, we may not substitute our judgment for that of the factfinder merely because we might reach a difference conclusion. *City of Keller*, 168 S.W.3d at 819; *Golden Eagle Archery Inc.*, 116 S.W.3d at 761.

### A.    Causation

To establish causation in a personal injury case, a plaintiff must prove the conduct of the defendant caused an event and this event caused the plaintiff to suffer compensable injuries. *Morgan v. Compugraphic Corp.*, 675 S.W.2d 729, 731 (Tex. 1984).    The issue here is the sufficiency of the evidence to support the jury's finding of a causal connection between A.S.'s sexual intercourse with N.F., who was previously infected with HSV-2, and A.S.'s injury, being infected with HSV-2.    The nature of A.S.'s injury is such that expert medical testimony was required to establish causation.    *See JLG Trucking, LLC v. Garza*, 466 S.W.3d 157, 162 (Tex. 2015) (expert testimony necessary to establish causation as to medical conditions outside jury's knowledge and experience); *Kaster v. Woodson*, 123 S.W.2d 981, 982–83 (Tex. Civ. App.–Austin 1938, writ ref'd) (expert testimony required to establish cause of infection).    To constitute evidence of causation, a medical expert's opinion must rest on reasonable medical probability. *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995).    But a personal injury claimant is not required to establish causation to a medical certainty nor is she required to exclude all other possible hypotheses.    *See Hospadales v. McCoy*, 513 S.W.3d 724, 737 (Tex. App.—Houston [1st Dist.] 2017, no pet.).    For legal sufficiency purposes, an expert's opinion might be no more than a scintilla of evidence when the opinion is, among other things, speculative, conclusory on its face, or assumes facts contrary to the undisputed facts.    *Id*.

Gary Richwald, M.D. testified as A.S.'s expert on causation.    He indicated he reviewed A.S.'s medical records, had two interviews with A.S. totaling about 2.75 hours, and reviewed the depositions in this case in formulating his opinions.    He opined that N.F. infected A.S. with

–4–

HSV-2 based on the following: (1) N.F. admitted he was infected with HSV-2 before he first had sexual intercourse with A.S.; (2) A.S. was exposed to HSV-2 when she had intercourse with N.F. without a condom on April 29 and April 30; and (3) A.S. had a positive culture on May 11 and was diagnosed with HSV-2 from a blood test taken on May 17, eighteen days after she first had intercourse with N.F. Richwald testified that his causation opinion was based on the May 17 blood test and the type of clinical signs and symptoms that A.S. experienced very soon after her initial sexual activity with N.F. and "that extended for a month following until very early June." According to Richwald, it was not just A.S.'s symptoms, but the type of symptoms and length of her first outbreak that had "clinical significance." He noted A.S.'s "constitutional or systemic" symptoms like body-wide, flu-like symptoms including fever and muscle aches that began on May 2 or May 3, as well as her very severe local symptoms, and the existence of bilateral lesions in her genital area, were indicative of a first outbreak of herpes. He also noted her extremely long first outbreak was strongly associated with an initial outbreak as opposed to a recurrent outbreak which might last a week to ten days. With respect to the May 17 blood test, Richwald testified that IgG antibodies start to develop almost immediately after exposure to the virus. He further testified that the test manufacturer and an article in a journal of sexually transmitted diseases indicates that the median at which people test positive is 21 days, meaning half the population will test positive by the 21st day and half the population will test positive after the 21st day. According to Richwald, in his own clinical experience, he had people as early as a week and a half or two weeks with positive blood tests. On cross-examination, Richwald testified that it was possible but very unlikely that A.S. had herpes before she had intercourse with N.F. but did not know it. N.F.'s counsel suggested that, absent a STD test showing A.S. did not have HSV-2 before she had sex with N.F., one could not conclude N.F. caused A.S. to be infected with HSV-2. Richwald responded that his opinion of causation was based on his

clinical experience, the lab result, the antibody test, plus the clinical syndrome A.S. presented along with her history of exposure and sexual activity.

N.F. argues Richwald's testimony was conclusory and therefore not competent evidence that N.F. caused A.S.'s herpes infection because he incorrectly stated IgG antibodies could be detected within three weeks of exposure rather than within onset of symptoms, improperly relied on A.S.'s lack of reported symptoms before exposure, claimed A.S.'s bilateral lesions and "constitutional symptoms" indicated an initial outbreak without supporting literature or evidence and asserted the severity of her symptoms suggested an initial outbreak while admitting a later outbreak could be more severe than an initial one. In essence, N.F. asserts that the herpes test did not determine the cause of A.S.'s infection and that without a negative herpes test taken before her first sexual encounter with N.F., Richwald cannot establish N.F. caused her infection. We disagree that the problems N.F. identifies with Richwald's testimony result in his opinion proving nothing more than the possibility that N.F. infected A.S.

Richwald was an expert in communicable diseases and was head of the country's largest STD clinic program in Los Angeles for eleven years. He supervised the clinic doctors and maintained a private practice, seeing patients one day a week who had been referred for complicated herpes or syphilis. From 2000 to 2010 he worked for drug companies giving 100 to 150 lectures a year primarily about herpes. In 2009, he co-wrote and co-edited a document used by practicing physicians to interpret and use the herpes antibodies blood test. He also worked on the document necessary for the FDA approval of the herpes blood test and analyzed the clinical data regarding when the patient was exposed to the virus and when they tested positive. He indicated that he still sees about 20 to 30 herpes patients per month. Accordingly, Richwald's causation testimony was based, at least in part, on his extensive experience studying STDs and treating patients with STDs including HSV-2.

Central to N.F.'s argument is that nothing supports the conclusion that a person could test positive for IgG just 18 days after initial exposure. Specifically, N.F. asserts the journal article on which Richwald relies does not support his causation testimony that the median time for testing positive was 21 days after exposure. Instead, N.F. points out, the article reports the median time from onset of symptoms to testing positive was 21 days. However, the journal article on which N.F. relies concluded that when two different herpes antibodies blood tests were used instead of just one the result was a 17-day median time for testing positive.[2] In addition, Richwald did not specifically tie the median time for testing positive to either the date of exposure or the date of onset. (In fact, Dr. Hunt who initially treated A.S. testified that it usually takes 21 days after *exposure* before a patient tests positive). In addition, Richwald testified that in his clinical experience, patients tested positive as early as 1 and 1/2 weeks. N.F. contends that because Richwald did not eliminate the possibility that these patients were previously infected but asymptomatic, it is no evidence of causation in this case.[3] We do not agree.

Richwald based his opinion on evidence that A.S. began experiencing symptoms as early as May 2 and that her May 17 blood test, taken 18 days after exposure (15 days after A.S. was

---

[2] "Seroconversion" is the term used in the article for testing positive for the antibodies in the patient's blood. "Time to seroconversion was defined as the number of days from the onset of primary symptoms (day 0) to the first positive serological test result, for each respective test." Two herpes antibodies blood tests studied in the article are abbreviated WB and HerpeSelect. In a section subtitled, "Increasing Sensitivity by Combining Tests," the article stated, "[b]ecause of the differences in seroconversion times and prevalence between the two tests, we explored the use of combined HerpeSelect and WB results for the most effective identification of new infections." The conclusion regarding the combined use of the tests stated in the article as related to HSV-2 antibodies is,

> Median time to seroconversion was reduced by about a week in each group when earliest time to positivity by either WB or HerpeSelect was compared with time to seroconversion by only HerpeSelect: . . . 17 versus 21 days for primary HSV-2 infection . . . .

The article does not define "median." The relevant definition from Merriam-Webster is "a value in an ordered set of values below and above which there is an equal number of values or which is the arithmetic mean of the two middle values if there is no one middle number." *See Median*, Merriam-Webster, https://www.merriam-webster.com/dictionary/median (last visited July 24, 2017). Therefore, one-half of the infected subjects of the testing reported in the journal article seroconverted before the 17-day median conversion.

[3] There was evidence that up to 80 percent of persons infected with HSV-2 do not realize they are infected because they are asymptomatic or experience mild symptoms or attribute their symptoms to some other medical condition such as a urinary tract infection or yeast infection.

symptomatic), was positive for HSV-2. The journal article on which N.F. relies clearly states that half of patients tested positive before 17 days after onset of symptoms when two blood tests were used and 21 days after onset of symptoms when only one blood test was used. This does not contradict Richwald's testimony. Richwald also stated A.S.'s early systemic complaints, bilateral lesions, as well as the length and severity of her outbreak indicated that this was an initial rather than recurrent infection. Contrary to N.F.'s contention, Richwald need not completely exclude the possibility that A.S. might have contracted HSV-2 before she had sex with N.F. *See Burroughs Wellcome Co.*, 907 S.W.2d at 499 (causation medical expert's opinion must rest on reasonable medical probability). We conclude that Richwald's testimony that N.F. infected A.S. with HSV-2 based on N.F.'s admission that he was infected before he had sex with A.S., A.S.'s sexual history, medical records, clinical symptoms, and blood tests constituted legally and factually sufficient evidence to establish causation. In reaching our conclusion we also reject N.F.'s contention that Richwald could not rely on his extensive clinical experience with HSV-2 infected patients and testing and needed additional medical literature to support his causation opinions. At best, N.F.'s argument goes to the weight to be given Richwald's testimony, which is clearly within the province of the fact-finder. *See Pilkington v. Kornell*, 822 S.W.2d 223, 230 (Tex. App.—Dallas 1991, writ denied). We resolve N.F.'s first issue against him.

### B. Future Medical Expenses

In his second issue, N.F. contends the trial court erred in rendering judgment on the jury's $300,000 award for future medical expenses because the evidence was legally and factually insufficient to support the award. Specifically, N.F. argues that, based on the jury award of only $7,522 in past medical expenses (from May 2012 through October 2015), A.S. would have to be 180 years old to incur the amount of future medical expenses the jury awarded. We do not agree

with N.F.'s underlying contention that the jury's award of past medical expenses necessarily limited the future medical expense award to $183.46 per month ($7,522/41 months) for the rest of her life. Notably, N.F. acknowledges that evidence of A.S.'s past medical expenses did not include charges for her visits to Dr. Hunt that she did not pay for based on N.F.'s arrangement of the appointments. Moreover, there was evidence from the time of her diagnosis in May 2012 through about October 2012, N.F. provided A.S. with free antiviral medicine. A.S. also testified that she did not have health insurance and, thus, was unable to seek all recommended treatment.

Under Texas law, A.S. must show there is a reasonable probability that medical expenses will be incurred in the future. *See Whole Foods Market Southwest, L.P. v. Tijerina,* 979 S.W.2d 768, 781 (Tex. App.—Houston [14th Dist.] 1998, pet. denied) (citing *Fisher v. Coastal Transp. Co.*, 230 S.W.2d 522, 523–24 (Tex. 1950)). There is no particular evidence required to support an award for future medical costs, and an award of future damages in a personal injury case is always speculative to some degree. *Pipgras v. Hart*, 832 S.W.2d 360, 365 (Tex. App.—Fort Worth 1992, writ denied). Life expectancy, medical advances, future costs of medicines, are not matters of certainty and therefore we are particularly reluctant to disturb a jury's award of these damages. *Sanmina-SCI Corp. v. Ogburn*, 153 S.W.3d 639, 643 (Tex. App.—Dallas 2004, pet. denied) (citing *Pipgras*, 832 S.W.2d at 365). Juries must often extrapolate an award of future medical damages and may base an award upon the nature of the injuries incurred together with the past medical treatment rendered, and the plaintiff's condition at trial. *Whole Foods Market Southwest, L.P.*, 979 S.W.2d at 781 (citing *Pipgras*, 832 S.W.2d at 365). The amount, if any, to award in future medical expenses is within the jury's sound discretion. *Sanmina-SCI Corp.*, 153 S.W.3d at 643. A factual sufficiency standard is used in determining whether an award for future medical expenses is excessive. *See Pope v. Moore*, 711 S.W.2d 622, 624 (Tex. 1986).

In his brief, N.F. concedes that herpes is incurable (consistent with all the medical testimony) and there is evidence that A.S. will need medical care in the future including future prescriptions for daily antiviral medicine and medicine to treat her post-herpetic neuralgia (nerve damage and pain). This would also necessarily require doctor visits associated with her condition. Although there was evidence that most patients with HSV-2 improve over time, Richwald testified that in 2015, over three years after her initial infection, A.S. was dealing with a chronic infection that was not responding well to treatment. He opined that A.S.'s very long first outbreak indicated she would experience frequent, subsequent outbreaks and more severe outbreaks which, according to Richwald, A.S. has had. (Dr. Hunt, whom N.F. arranged to treat A.S., testified that A.S.'s more frequent outbreaks indicated she had a more difficult case than most.") Richwald also noted her neuralgia was extending to the top and above the pubic area and into the groin. "And I've seen this, that you have more and more outbreaks." He further testified A.S. has significant problems with her HSV-2 infection and still having bilateral outbreaks, which is unusual and usually means she has much more virus present. He further testified she has very frequent outbreaks, about twelve a year, that are painful.

Dr. Torres, A.S.'s treating doctor, testified that A.S. had severe complications with her infection and did not respond well to the usual treatment. She also testified that she tried to refer A.S. to an infectious disease doctor but A.S. could not see him because she did not have insurance. At trial, A.S. testified she continues to suffer from outbreaks and experiences pain every day to varying degrees. The record reflects that A.S. had sixteen doctor's visits from May 2012 through June 2015. Those doctor visits for which the record contains charges, varied from $115 to $175 per visit. At trial, A.S. testified she was taking three medicines: an antiviral drug, a drug for nerve pain, and an antidepressant that also helps with the nerve pain. A.S. provided evidence of the costs these prescriptions. A 30-day supply for the antiviral drug in various

dosages and quantities generally ranged in price from $55.51 to $159.75, although one prescription cost $558.99 for 50 pills. A 30-day supply of the antidepressant ranged from $6.99 to $13.69, and a 30-day supply of the drug for nerve pain ranged in cost from $14.92 to $20.58. The record also contains various other prescriptions, including, but not limited to, one topical ointment that cost $497.99, and two gels that cost $96.99 and $72.83 respectively. At the time of trial, A.S. was forty-four years old and there was evidence that her HSV-2 infection would require recurring doctor's visits and daily medication for the rest of her life. Based on the foregoing, we conclude the evidence was legally and factually sufficient to support the jury's award of future medical expenses. We resolve N.F.'s second issue against him.

### C.    Motion to Strike Richwald's Testimony

In his third issue, N.F. argues that if we conclude there was sufficient evidence to support causation, the judgment should nevertheless be reversed and the case remanded because the trial court erred in denying his motion to strike Richwald's testimony concerning whether a person could test positive for HSV-2 less than 21 days following initial exposure. He asserts that, because the journal article Richwald cited to support his opinion actually measured the period from initial onset of symptoms to a positive blood test, Richwald's testimony on this issue is clearly incorrect and should have been stricken. We disagree. As we noted above, the journal article on which N.F. relies concluded that when two herpes antibodies blood tests were used the result was a 17-day *median* time for testing positive after the onset of symptoms—meaning one-half the subjects tested positive before seventeen days.[4] In addition, Richwald's testimony on the earliest a person could test positive after exposure was not based solely on the journal article but also his extensive clinical experience as well as data he saw when he was consulting with the test manufacturers. Richwald indicated he saw data from four or five different sources and that there

---

[4] *See supra* n.2.

were patients who tested positive at less than 21 days, some at two weeks, and some at various numbers of days. He noted there was a "very rapid development early for about half of the people [infected]." The journal article does not contradict Richwald's testimony. The article affirmatively states a patient could test positive less than 17 days after she became symptomatic which for A.S. was 3 days after exposure thereby directly contradicting N.F.'s argument that the article stated a patient could not test positive less than 21 days after becoming symptomatic. In fact, N.F.'s own expert witness used the date of exposure when measuring the time patients tested positive. Because the article was not the sole basis for Richwald's testimony that A.S. could test positive 18 days after exposure and the article concluded a patient could test positive 17 days after onset of symptoms if both tests were used, N.F. has not established the trial court erred in denying his motion to strike. We resolve N.F.'s third issue against him.

## CONCLUSION

Based on the record before us, we conclude the evidence is legally and factually sufficient to support the jury's finding on causation and its award for future medical expenses. We further conclude that the trial court did not err in denying N.F.'s motion to strike Richwald's testimony concerning whether a person could test positive for HSV-2 in less than three weeks following exposure. Having determined all of N.F.'s issues lack merit, we affirm the trial court's judgment.

160254F.P05

/David W. Evans/
_____
DAVID EVANS
JUSTICE